**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIE GARDLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 20 C 5149** |
| | ) | |
| **CITY OF CHICAGO and CHICAGO** | ) | |
| **POLICE DETECTIVE JOHN KOROLIS,** | ) | |
| **STAR NO. 21339,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Willie Gardley has sued Chicago Police Detective John Korolis and the City of

Chicago under 42 U.S.C. § 1983 and state law. Gardley claims Korolis violated his

Fourth and Fourteenth Amendment rights and Illinois law in connection with Gardley's

arrest, indictment, and detention for the 2015 murder of Ronnie Shaw. Gardley alleges

(1) unreasonable seizure in violation of the Fourth and/or Fourteenth Amendment for

arresting him without probable cause on March 14, 2019 (count one); (2) unreasonable

detention for detaining him for eight months pre-trial without probable cause in violation

of the Fourth Amendment (count two); and (3) malicious prosecution under state law for

subjecting him to a criminal prosecution without probable cause. He has named the

City as a defendant only on his state-law claim of malicious prosecution on a theory of

respondeat superior. The defendants have moved for summary judgment on all three of

Gardley's claims, arguing that Korolis had probable cause to arrest, detain, and assist in

the prosecution of Gardley, or alternatively (with respect to the section 1983 claims only) that he is entitled to qualified immunity. For the reasons below, the Court grants summary judgment for the defendants on Gardley's Fourteenth Amendment claim but otherwise denies their motion.

### Background

The following facts are undisputed except where otherwise noted. On May 25, 2015, Ronnie Shaw was chased down by an assailant and shot several times at 4956 W. Erie Street, Chicago, near the northeast corner of Erie and Lavergne. Once Shaw fell to the ground, the assailant shot him several more times at close range. Shaw was pronounced dead at Mt. Sinai Hospital about an hour later.

Immediately after the shooting, police canvassed the area to locate and interview witnesses. One such witness was Dareon Winston, who lived across the street from where Shaw was killed. The contents of Winston's statements to police are heavily disputed.

Korolis contends that Winston gave an on-scene Chicago Police Department (CPD) detective a detailed account of the shooting and a description of the shooter, both of which said he could see from his porch. During his 2021 deposition, however, Winston denied ever having seen Shaw get shot or that he caught anything more than a one second glimpse of the shooter, saying he was already inside his house when he first heard gunshots. Winston also testified during his deposition that he told detectives all of this on the night of the shooting and repeated the same in later conversations with CPD officers and prosecutors from the Cook County States Attorney's Office (CCSAO). Korolis says that Winston described the shooter as a Black male, approximately 18-19

2

years old, 5 feet 9 inches tall, wearing a black baseball hat, a maroon two-piece jogging outfit, and white gym shoes.  During his deposition, however, Winston testified that he told detectives that the shooter wore his hair in braids and that he was not wearing a hat.  He also testified that he told detectives that he could not remember the shooter's face.

On May 26, 2015, Shaw's sister Erica Goodlow met with Korolis to share second-hand information about the assailant that she had learned since the shooting, namely: (1) he went by the nickname "Flocka"; (2) he was a member of the Travelling Vice Lords (TVLs) street gang; (3) he was recently released from jail; (4) he wore dreadlocks; (5) he was from the Ferdinand/Leamington area; and (6) he was pictured on his Facebook page under the name "LpmgFlock Rustworld."  Using this information, Korolis searched CPD's databases and found Gardley's booking photos and other information.  Korolis believed this matched information provided by Goodlow and other witnesses because it indicated Gardley was a 5-foot, 10-inch, 20-year-old Black male who recently had been released from prison and whose last documented address was on Leamington Avenue. Gardley disputes that the Facebook photos that Korolis used for comparisons to mugshots were pictures of him; he contends they were photos of his recently deceased friend.  Korolis testified during his deposition that he was not sure if the profile picture from the Facebook account referenced by Goodlow depicted Gardley.  In a video-recorded interview following his arrest, Gardley told police that his nickname is "Flock," not "Flocka," and that he has never had dreadlocks.

On May 30, 2015, Korolis met with Derrick Lewis, another individual who claimed to have information about the Shaw murder.  In police reports and during his deposition,

Korolis stated that Lewis told him that on the night of the murder, he was walking northbound on Lavergne toward Huron when he observed a Black male with dreadlocks, known to him only as "Flocka," chase down and shoot Shaw before fleeing on a bicycle.  In police reports and during his deposition, Korolis also stated that Lewis told him Flocka came into his barber shop several days later with crudely cut dreadlocks and asked Lewis to clean and even out his haircut.  Lewis was also shown Gardley's photograph and identified him as the person who killed Shaw, but he refused to sign off on his identification.  During his 2021 deposition in the present case, however, Lewis testified that he did not witness Shaw's murder, was intoxicated when he spoke to detectives, was not shown any photos for identification, and only told detectives information that he had learned from other people.

On June 2, 2015, detectives conducted a follow-up interview with Winston at his home during which they asked him to identify the shooter from a photo array that included Gardley's mugshot.  In police reports and during his deposition, Korolis stated that Winston confidently identified Gardley as the shooter but refused to sign his identification out of fear of retaliation.  Winston testified during his deposition that he was shown photos but did not recognize anyone in them; he also testified that he told detectives this when they interviewed him that night.

On July 14, 2015, Korolis conducted a follow-up interview with Lewis, this time with an assistant state's attorney (ASA) present.  Lewis signed a written eight-page statement in which he identified Gardley as the shooter.  Lewis testified during his deposition that he did not know that the statement he signed said he witnessed Shaw's murder, nor did he recall identifying Gardley as the shooter from a photo array and

4

signing the identification.  He did, however, recall detectives suggesting that his sentence would be reduced if he cooperated with them, and that they kept putting Gardley's photo in front of him as they asked him repeatedly about the shooting.  Lewis further testified during his deposition that he told someone in law enforcement that he never witnessed Shaw's murder.

Though Gardley disputes the parts of Korolis's Local Rule 56.1(a) statement of facts that were based solely on police reports, those reports state that between September 2015 and October 2018, CPD did not uncover any further eyewitnesses, forensic evidence, or other substantive evidence about Shaw's murder.

 In police reports and during his deposition, Korolis said that in March 2018, Winston told him that he did not want to testify or cooperate with law enforcement out of fear of retaliation.  In October 2018, Lewis likewise refused to cooperate further with the police, and he recanted his prior identifications and statements.  The following November, Korolis presented the Shaw murder investigation to the CCSAO. Prosecutors then decided to issue a grand jury subpoena for Winston's testimony and bring Lewis in for another interview, despite their stated reluctance to cooperate.

Prior to testifying before the grand jury, Winston again met with detectives, this time with ASAs present.  According to police reports and his deposition, Korolis contends that Winston relayed the same account of the shooting that he had given years earlier, including his identification of Gardley as the shooter.  Winston testified during his deposition, however, that he did not recognize anyone in the photographs shown to him by detectives; he told them that; and they were trying to get him to say things he did not want to say.

5

Winston testified before the grand jury on December 10, 2018. He testified that he saw Gardley murder Shaw, and he identified Gardley from a "six-pack" photo array, signing his name in the jurors' presence. Winston also told the grand jury that he was reluctant to be there because he still lived in the same neighborhood and was worried about repercussions his testimony could have on his family. During his deposition and in his response brief, Gardley contends that Winston's reluctance resulted from feeling pressure to make an identification despite not knowing whether he was identifying the correct person, and pressure to say things he did not want to say. Winston testified during his 2021 deposition that he was not sure if the person he identified before the grand jury was the shooter and that he signed the identification despite this because he wanted to get out of there.

On January 10, 2019, Korolis interviewed Renard Williams, another individual who reached out to CPD to provide information relating to Shaw's murder. Williams claimed he was in the area when the shooting occurred, and he implicated an individual named Darius Murphy as the person who shot Shaw. Korolis testified during his deposition, and stated in police reports, that he did not find Williams credible due to inconsistencies and impossibilities between his account and the accounts of others. Korolis also testified during his deposition that he did not do any follow-up investigation regarding Murphy's possible involvement in the murder, nor did he document his doubts about Williams's credibility. In addition, Korolis did not disclose his interview of Williams or the information Williams provided to the CCSAO until after Gardley was indicted. Former ASAs Laura Ayala-Gonzalez and Yvette Loizon—who reviewed the Shaw investigation and/or were involved in Gardley's prosecution—both testified during their

depositions that they did not learn about Williams's statements regarding Murphy's involvement in the murder until after Gardley was indicted. In Ayala-Gonzalez's case, she did not learn about Williams's implication of Murphy until several days before her 2022 deposition.

Murphy himself took responsibility for Shaw's murder in a recorded statement with a cooperating witness. The parties dispute whether the CCSAO agreed with Korolis's belief that both Williams and Murphy lacked credibility. Some deposition testimony suggests that ASAs agreed with Korolis's assessment, and other testimony suggests the opposite. For example, ASA Jane Sack—who took over Gardley's prosecution in October 2019 and who ultimately decided to dismiss the charges— testified that three different people provided statements that corroborated Williams' statement. ASA Loizon testified, however, that in the past Murphy had taken credit for many murders that he did not in fact commit. Loizon acknowledged during her deposition, however, that Williams's statement constituted potentially exculpatory information.

On March 14, 2019, Derrick Lewis recanted his statement and identification of Gardley as the shooter, stating that everything he had told police and prosecutors was a lie that he had told in order to help himself. Later that day, Gardley was taken into custody.

On March 15, 2019—the day after Gardley's arrest—Korolis asked the Illinois Department of Corrections (IDOC) to provide copies of its most recent photographs of Gardley in order to see the length of his hair prior to the murder, and particularly to see if he had dreadlocks as witnesses had described. Korolis received an e-mail with

photos from the IDOC which showed that, as of seven days before the murder of Ronnie Shaw, Gardley did not have dreadlocks. Though Korolis testified during his deposition that he is confident he presented the photos to the CCSAO, Loizon testified in hers that she did not become aware of the photos until sometime after Gardley's indictment. About ten hours after Korolis received the photos—and after Gardley was already in custody—Ayala-Gonzalez approved the charges against Gardley.

Korolis admits for purposes of the summary judgment motion that he knew that the CCSAO was relying upon him to provide accurate information and not to withhold information related to the investigation of Shaw's murder. He also knew he was the CCSAO's primary source of information for what police learned during the investigation.

Once ASA Sack took over Gardley's case in October 2019, she learned that: (1) there were statements from three individuals corroborating Williams's account that Murphy (not Gardley) was the person who killed Shaw; (2) Murphy was known to law enforcement for committing other gang-related murders; and (3) he had been recorded taking responsibility for Shaw's murder. ASA Sack concluded that prosecutors could not meet their burden of proving beyond a reasonable doubt that Gardley killed Shaw, and she later recommended dismissing the charges against him. Sack authored a memo on December 13, 2019 explaining her decision. She described Gardley's prosecution as a "single finger identification case by a witness who no longer wishes to cooperate," and she stated that "more witnesses are naming Murphy as the shooter than are naming our defendant." Def. Ex. 20.

On December 27, 2019, the CCSAO dismissed all charges against Gardley. Gardley filed this lawsuit in September 2020, alleging that Korolis violated his Fourth

8

Amendment right to be free from unreasonable seizure and unlawful detention and engaged in malicious prosecution.  As indicated, Gardley also names the City of Chicago as a vicarious liability defendant on the malicious prosecution claim.  The defendants have moved for summary judgment.

## Discussion

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The Court may not make credibility determinations, weigh the evidence, or decide which inference to draw from the facts; those are jobs for a factfinder.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  A court may not grant summary judgment if a reasonable jury could find for the nonmoving party.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986).

### A.    Constitutional claims

#### 1.    Fourth Amendment

Gardley brings his federal claims against Korolis under 42 U.S.C. § 1983.  To succeed on a claim under section 1983, a plaintiff must show that the defendant, acting under color of state law, deprived him of a right secured by the Constitution or federal law.  *Thurman v. Village of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006).  Gardley contends that the defendants violated his Fourth Amendment right to be free from

unreasonable seizure by arresting and then unlawfully detaining him without probable cause to believe that he had murdered Shaw. The Fourth Amendment guarantees that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. Amend. IV. To succeed on either claim, Gardley must show that he was arrested and detained without probable cause. *Brooks v. City of Chicago*, 564 F.3d 830, 832 (7th Cir. 2009). The Court will therefore consider counts one and two together.

Probable cause exists when the facts and circumstances known to the arresting officer would lead a prudent person to believe a person had committed or was committing an offense. *See*, *e.g.*, *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001). Police officers have probable cause to arrest and detain a person when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the [person] had committed an offense." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). Though probable cause for arrest is measured at the time of arrest, an officer's initial determination of probable cause is reviewable following a suspect's arrest and during his prolonged detention. *Gerstein v. Pugh*, 420 U.S. 103, 111-116 (1975). The existence of probable cause is typically a jury question, but summary judgment is appropriate if there is "no room for a difference of opinion concerning the facts" or the "reasonable inference to be drawn from them." *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 473 (7th Cir. 1997).

The Court finds that there are genuine factual and inferential disputes that

preclude entry of summary judgment on the question of probable cause. Korolis contends he had probable cause to arrest and detain Gardley based on Winston's eyewitness testimony identifying Gardley as the person who killed Shaw. The record, however, includes evidence sufficient to permit a reasonable jury to find that Korolis knew Winston could not actually identify the shooter and/or that the person Winston supposedly identified, Gardley, was unlikely the shooter. Both Winston and Lewis have testified that the reports documenting their statements to police do not reflect what they actually told police. Winston further testified that his grand jury testimony about Shaw's murder was not an accurate reflection of his knowledge about the murder and that he was pressured by police (which a jury reasonably could infer includes Korolis) into making an identification. A reasonable jury could find this testimony is credible and could, as a result of this and other evidence, find enough basis to doubt that Gardley was involved and thus that Korolis lacked probable cause to arrest and charge him with Shaw's murder.

Even if Winston and Lewis's 2021 deposition testimony does not create a genuine factual dispute over the existence of probable cause, other evidence in the record most certainly does. For example, Korolis knew prior to Gardley's arrest that Murphy—who had been charged with other gang-related murders—had taken responsibility for Shaw's murder and that Williams had attributed the murder to Murphy as well. A jury could find that a reasonably prudent officer in Korolis's position would have understood this to undermine his basis for probable cause. The record shows that after speaking with Williams just once, Korolis made an independent determination about Williams's credibility and completely stopped exploring Murphy as a suspect. Nor

did Korolis revisit the possibility of Murphy as a suspect after hearing Murphy's own recorded statement to an informant taking responsibility for the murder. Though the Seventh Circuit does not impose a duty to investigate on an officer once he learns sufficient trustworthy information establishing probable cause, *see, e.g., Beauchamp v. City of Noblesville*, 320 F.3d 733, 744 (7th Cir. 2003), the evidence in Korolis's possession undercutting the identification of Gardley would permit a reasonable jury to find that he lacked "sufficient trustworthy information" establishing probable cause with respect to Gardley.[1]

The record also shows that before Gardley was formally charged, Korolis received photos from IDOC which answered the very question that caused him to request the photos in the first place: did Gardley have dreadlocks when he was released from prison a week before Shaw's murder, as Goodlow and Lewis described the shooter as having? The photos Korolis received pictured Gardley with short hair. Gardley contends that this destroys one of Korolis's main bases for probable cause, as his guiding description of the shooter which he carried throughout the investigation included dreadlocks. Korolis contends that the IDOC photos were immaterial to his basis for probable cause, because dreadlocks could have been sewn onto Gardley's short hair sometime in the week between his release and the shooting. There is also

---

[1] The Court also notes that in *Beauchamp*, the Seventh Circuit left open the possibility that an officer would have to undertake further investigation to establish probable cause if there was a "solid claim"—for example, an alibi establishing a suspect's whereabouts example—casting doubt on the existing evidence. *Beauchamp*, 320 F.3d at 744. In that case, the Court rejected an alibi defense as triggering a duty to investigate "in the face of a reasonably believable witness and readily observable events." *Id*. The evidence Gardley cites, by contrast, was arguably known to Korolis and undermines the believability of the witnesses he claims to have relied upon to support probable cause to arrest and charge Gardley.

conflicting deposition testimony about whether, and when, Korolis shared these photos with the CCSAO.

In short, there are several genuine factual disputes over the bases asserted as probable cause for Gardley's arrest and detention. Summary judgment is therefore inappropriate.

### 2. Fourteenth Amendment

In his complaint, Gardley also alleges that his wrongful arrest and detention violated the Fourteenth Amendment. The Supreme Court has determined that claims alleging substantive due process violations often are more appropriately analyzed under the more specific guarantees of the various provisions of the Bill of Rights. *Graham v. Connor*, 490 U.S. 386, 395 (1989). If a constitutional amendment "provides an explicit textual source of constitutional protection" against a particular kind of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id*. For example, when "the nature of the allegations fall clearly within the ambit of those activities regulated by the Fourth Amendment," there is no need for the Court to further analyze the case under the Fourteenth Amendment. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994) (affirming the district court's dismissal of a Fourteenth Amendment claim that overlapped with a Fourth Amendment claim). The clear textual source of constitutional protection regarding the wrongdoing that Gardley alleges Korolis committed—unlawful arrest without probable cause—is the Fourth Amendment. Thus there would not appear to be any basis for a separate Fourteenth Amendment claim. Gardley has essentially conceded this point by using "and/or" in his complaint regarding which Amendment he

claims was violated by his unlawful arrest, and by not offering any arguments regarding due process in his response to the motion for summary judgment. For this reason, the Court grants summary judgment on Gardley's Fourteenth Amendment claim.

## B. Qualified immunity

Korolis argues in the alternative that he is entitled to qualified immunity. The doctrine of qualified immunity shields a government official from liability for civil damages to the extent that his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating qualified immunity, the court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 232 (2009). There is no doubt that the right Gardley claims was violated was a clearly established right of which Korolis would have known. So the question of qualified immunity turns on whether there are facts showing that Korolis violated those rights by arresting and detaining Gardley on what a jury could find was less than probable cause.

Under the doctrine of qualified immunity, an officer who mistakenly believed there was probable cause may be shielded from liability "if a reasonable officer could have believed the [arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013). Referred to as "arguable probable cause," this inquiry is separate from the probable cause inquiry, in that it concerns "whether it would be clear to a reasonable

14

official that his or her conduct was unlawful in the situation." *McComas v. Brinkley*, 673 F.3d 722, 725 (7th Cir. 2012).

Korolis is not entitled to summary judgment on the basis of qualified immunity due to the same factual conflicts that preclude entry of summary judgment on the question of probable cause. For example, the same direct factual contradiction between Winston's 2018 grand jury testimony and Winston's 2021 deposition testimony that prevents the Court from determining, on summary judgment, that there was probable cause to arrest and detain Gardley for the murder also precludes the Court from determining, on summary judgment, that there was arguable probable cause. *See Williams v. City of Chicago*, 733 F.3d 749, 757, 761 (7th Cir. 2013) (plaintiff was entitled to benefit of conflicting testimony including reasonable inference Chicago police officers were lying). Moreover, evidence tending to show that Korolis withheld exculpatory evidence from prosecutors regarding an alternate suspect and photos of Gardley with short hair (after witnesses described the shooter as having dreadlocks) similarly precludes a finding of arguable probable cause at summary judgment.

Witness identifications that are the product of coercion or manipulation cannot create probable cause or arguable probable cause. *See Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015). Winston's testimony provides evidence that would permit a reasonable jury to conclude that Korolis pressured him to provide the grand jury with an identification that Korolis knew was unreliable. Further, Korolis testified during his deposition and argued in his opening brief that Winston's testimony was the basis for his finding of probable cause. If Winston's identification was the product of coercion and is therefore removed as a basis for probable cause, then the record shows few, if any,

facts known to Korolis that could collectively add up to probable cause. *See, e.g., Kuri v. Folino*, 409 F. Supp. 3d 626, 647 (N.D. Ill. 2019).

Korolis argues that Gardley is attempting to avoid summary judgement by creating a "sham issue of fact" through Winston's deposition testimony. *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169 (7th Cir. 1996). *Bank of Illinois*, however, dealt with the more common issue of a party submitting an affidavit to clean up the party's own earlier, unfavorable deposition testimony given in the same lawsuit. That's not the situation here. This isn't a situation where Winston is trying to repair damaging testimony he gave in this case; rather he's saying that pre-lawsuit statements and testimony that he gave—which is among the key evidence in the case— were false. The other authority used by Korolis to argue this point is *Gray v. Ameritech Corp.*, 937 F. Supp. 762 (N.D. Ill. 1996). *Gray* is also distinguishable. In *Gray*, a plaintiff alleging disability discrimination gave deposition testimony that jeopardized her claim that she was disabled. The deposition recessed and then resumed several days later. Under examination by her own attorney, Gray recanted her unfavorable prior answers. In her response to Ameritech's motion for summary judgement, Gray included an affidavit in which she doubled down on the revision of her initial deposition testimony.

The facts and posture of *Gray* are materially distinguishable from this case in several ways. First, the conflicting testimony at issue here was not from consecutive days of the deposition of a plaintiff or another witness. Nor was the conflicting testimony presented in the form of a Hail Mary affidavit from a party who regretted testimony she gave in her deposition. Rather, the contradicting testimony here is from a non-party witness approximately three years after he testified before the grand jury; and

16

he's saying that testimony was both false and coerced. The record is clear that Winston was reluctant to give his testimony on both occasions. In addition, Korolis's repeated characterization of Winston's grand jury testimony as "unequivocal" misses the point. There is no rule of law that bars a witness from recanting testimony given on an earlier occasion. There may be reason for a jury to view the recantation with suspicion, but there's no rule that authorizes wiping the recantation from the record for summary judgment purposes. Moreover, there is nothing to suggest that Winston changed his story to gain some legal advantage, which is what the plaintiffs in the cases cited by Korolis did. In short, Korolis's argument that Winston is essentially bound to his grand jury testimony for all time lacks merit. Gardley may rely on Winston's deposition testimony to show the existence of a genuine factual dispute.

Aside from Winston's testimony, there are other genuine factual disputes—such those arising from Murphy's possible role in the shooting and the IDOC photos of Gardley without dreadlocks—that bear on the objective reasonableness of Korolis's determination of probable cause. For all of these reasons, he is not entitled to summary judgment on the basis of qualified immunity. *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008). Korolis's arguments regarding qualified immunity are premised on his version of the facts, which are both genuinely disputed and not rendered by him in the light most favorable to Gardley. *See Bayon v. Berkebile*, 29 F.4th 850, 854–55 (7th Cir. 2022) (officers cannot assume the acceptance of their version of numerous disputed facts when arguing for qualified immunity).

## C.    Malicious prosecution

Gardley's second claim is a state law claim for malicious prosecution. Under

Illinois law, to succeed on this claim, Gardley must prove: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Ritchey v. Maksin*, 71 Ill. 2d 470, 475, 376 N.E.2d 991, 993 (1978).

Korolis contends that there is no genuine factual dispute regarding any of these requirements. The Court disagrees. Gardley has offered evidence that Korolis may have lied, pressured witnesses, and/or withheld evidence from prosecutors, causing them to wrongfully charge Gardley with Shaw's murder. Gardley has also offered evidence that would permit a jury to find Korolis maliciously prosecuted him without probable cause and that he suffered damages as a result of Korolis's actions. This evidence would permit a reasonable jury to find each the elements of malicious prosecution under Illinois law.

### 1. Commencement of a proceeding

Korolis argues that he did not "commence" or "continue" Gardley's prosecution, as it was pursued by independent prosecutors. This argument that only prosecutors, and not police, can engage in malicious prosecution fails. The Seventh Circuit has consistently recognized malicious prosecution claims against police officers, particularly when there has been an allegation of misconduct on the part of the police. *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996). *See also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading

information that influenced the decision" from liability for constitutional or state-law violations).  Gardley has presented evidence sufficient for a reasonable jury to find that Korolis failed to provide potentially exculpatory evidence to the CCSAO and/or that he pressured witnesses to give false identifications.  There is therefore a genuine factual dispute regarding Korolis's commencement or continuation of the proceedings against Gardley.

### 2.    Favorable termination

Gardley argues that Korolis is not entitled to summary judgment because a reasonable trier of fact could find that the proceedings against Gardley were terminated in his favor.  "[A] malicious prosecution cannot be predicated on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused."  *Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996).  This is determined not by reference to "the form or title given to the disposition of the prior proceeding, but by the circumstances under which that disposition is obtained."  *Cult Awareness Network v. Church of Scientology Int'l*, 177 Ill. 2d 267, 276, 685 N.E.2d 1347, 1352-53 (1997).

Korolis argues that the CCSAO dismissed the charges against Gardley only because of its inability to prove his guilt beyond a reasonable doubt, not because he was innocent.  But a dismissal based on an inability to prove guilt cannot reasonably be characterized as "not indicative of the innocence of the accused."  That aside, a reasonable juror could find that the CCSAO's inability to prove guilt is indicative of Gardley's innocence because the evidence prosecutors had against him was both thin and fraught with problems.  As discussed above, the parties present conflicting

accounts of what various witnesses did or did not see, who was able to make a clear identification of the shooter, and what that shooter looked like. Gardley has also offered evidence that both police and prosecutors involved in case were aware of an alternate suspect, albeit at different points in the proceeding. Again, ASA Sack herself described Gardley's prosecution as a "single finger identification case by a witness who no longer wishes to cooperate" and stated that "more witnesses are naming Murphy as the shooter than are naming our defendant." Sack Memo, CCSAO 000944. A jury could reasonably infer that prosecutors dropped the case because information they had made it very possible that Gardley was not the shooter. As such, a genuine issue of fact exists concerning whether the CCSAO's entering of the *nolle prosequi* satisfies the favorable termination requirement.

3. **Absence of probable cause**

Korolis argues, as he did on Gardley's constitutional claim and on the issue of qualified immunity, that he had probable cause to arrest and detain Gardley. Probable cause for purposes of an Illinois malicious prosecution claim is defined in essentially the same way as it is for Gardley's Fourth Amendment claims. *See*, *e.g.*, *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 642, 784 N.E.2d 258, 266 (2002) ("Probable cause is a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion the accused committed the offense charged."). In fact, the Seventh Circuit has squarely rejected a contention that probable cause should be defined in a different way for malicious prosecution claims than for false arrest claims. *See Johnson v. Saville*, 575 F.3d 656, 662 (7th Cir. 2009). The Court's earlier discussion of probable cause and the existence of genuine factual disputes is

20

thus equally applicable here.

Korolis argues that the fact that a grand jury indicted Gardley for the Shaw murder is prima facie evidence of probable cause. *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). Gardley rightly points out, however, that the return of an indictment is not conclusive evidence of probable cause. *Freides v. Sani-Mode Mfg. Co.*, 33 Ill. 2d 291, 295-96, 211 N.E.2d 286, 288-89 (1965). It may be rebutted by other evidence such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, or by failing to make a full or complete statement of facts, or by other improper or fraudulent means. *Id.*; *see also Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008) (whether police misled prosecutors about facts supporting a prosecution by providing false information and withholding exculpatory evidence was a jury question).

Gardley contends Winston's allegedly false grand jury testimony and false identification were material and contributed to the decision to charge him. If the jury agrees, Gardley's contention that Winston testified falsely would rebut the presumption that the indictment is evidence of probable cause and would support his malicious prosecution claim. In this situation, a factfinder simply sets aside the perjured testimony and examines whether the remaining evidence adds up to probable cause. *See Cervantes v. Jones*, 188 F.3d 805, 811 n.7, 814 (7th Cir. 1999) (stating that indictment obtained by allegedly perjured testimony would not be considered, but still finding probable cause to prosecute based on remaining evidence). The same analysis is used for summary judgment purposes when some of the information relied on for probable cause is disputed: a court looks at the remaining, undisputed information, and if it is

sufficient to establish probable cause, the existence of a factual dispute regarding other information does not prevent entry of summary judgment. *See Johnson*, 575 F.3d at 662; *Logan v. Caterpillar*, 246 F.3d 912, 926 (7th Cir. 2001). But in light of Korolis's admission that Winston's eyewitness testimony is the primary basis for probable cause and the fact that Gardley has offered evidence that would indicate that Winston's grand jury testimony was false and the product of police pressure, there is insufficient undisputed information left to establish probable cause.

### 4. Malice

Both parties make essentially the same arguments regarding malice as they do regarding the indictment-based presumption of probable cause issue just discussed. Korolis argues that probable cause proves an absence of malice. *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 76-77, 791 N.E.2d 1206, 1222-1223 (2003). Gardley, by contrast, contends that malice may be inferred from a lack of probable cause when the circumstances are inconsistent with good faith, as he alleges is the case here. *Reynolds v. Menard, Inc.*, 365 Ill. App. 3d 812, 821, 850 N.E.2d 831, 839 (2006); *Williams*, 733 F.3d 749, 759-60 (7th Cir. 2013) (sufficient evidence of malice where Chicago police "concocted" charge and lied about witnessing crime); *Bianchi v. McQueen*, 2016 IL App (2d) 150646, ¶ 80, 58 N.E.3d 680, 699 (intentionally fabricating evidence and concealing exculpatory evidence is sufficient evidence of malice). The same genuine issues of fact that defeat summary judgment on the other points addressed above defeat it here as well. Gardley has presented evidence, in the form of multiple individuals' deposition testimony, from which a reasonable trier of fact could find malice on Korolis's part.

22

**5.    Damages**

Defendants do not contend that Gardley cannot show damages caused by malicious prosecution, so the Court need not address that point.

\*         \*         \*

For the reasons stated above, defendants are not entitled to summary judgment on Gardley's claim for malicious prosecution.

### Conclusion

For the foregoing reasons, the Court denies defendants' motion for summary judgment [dkt. nos. 79, 83, 86] on all but plaintiff's Fourteenth Amendment claim.  The Fourteenth Amendment claim (part of count one) is dismissed.  The case is set for a telephonic status hearing on October 25, 2022 at 8:50 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.  The following call-in number will be used:  888-684-8852, access code 746-1053.

MATTHEW F. KENNELLY
United States District Judge

Date:  October 11, 2022